A98A1136. HINDMAN v. THE STATE.
A98A1137. FORTNER v. THE STATE.
A98A1138. BURNETT v. THE STATE.
(507 SE2d 862)

RUFFIN, Judge.

James Hindman, Donald Ray Burnett, and Marshall Eugene Fortner were each convicted of armed robbery, eight counts of aggravated assault, theft by taking, possession of a firearm during the commission of a crime, and possession of a firearm by a convicted felon. All three defendants received life sentences on the armed robbery convictions pursuant to OCGA § 17-10-7 (b) (2), the recidivist statute. In Case No. A98A1136, Hindman appeals, asserting that (1) the evidence was insufficient to convict him on the armed robbery, theft by taking, aggravated assault, and possession of a firearm counts, (2) the trial court improperly admitted evidence of his prior criminal convictions, (3) a fatal variance existed between the armed robbery indictment and the evidence adduced at trial, and (4) OCGA § 17-10-7 (b) (2) is unconstitutional. In Case No. A98A1138, Burnett raises the same issues as Hindman. In Case No. A98A1137, Fortner raises the same issues, except that he does not challenge the sufficiency of the evidence as to the theft by taking, armed robbery, and aggravated assault convictions. Fortner also does not challenge the conviction of possession of a firearm by a convicted felon on the grounds that there was no evidence he had a firearm. For reasons

which follow, we affirm the convictions and sentences as to all three defendants.

"On appeal from a criminal conviction, the evidence must be construed in the light most favorable to the verdict, and the appellant . . . no longer enjoys a presumption of innocence; moreover, an appellate court does not weigh the evidence or determine witness credibility but only determines whether the evidence is sufficient under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) [(1979)]. Conflicts in the testimony of the witnesses, including the State's witnesses, [are] a matter of credibility for the jury to resolve. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld." (Punctuation omitted.) *Howard v. State*, 227 Ga. App. 5, 8 (6) (a) (488 SE2d 489) (1997).

Viewed in this light, the evidence reveals that Pam Garland was working as the branch manager of the Cleveland Road Wachovia Bank in Whitfield County, Georgia, at 2:30 p.m. on April 24, 1996, when two masked men robbed the bank. Garland said one of the robbers was wearing camouflage coveralls and a hat in addition to the mask. This man came into her office, pointed a handgun at her, and ordered her to go to the lobby and sit on the floor. Garland testified that this robber pointed a gun at another Wachovia employee, Joey Parrott, placed his foot on Parrott's back, and threatened to kill him. She said this robber stayed in the lobby area of the bank building while the other robber jumped over a teller window.

Garland testified that the robber who jumped over the teller window was wearing coveralls and was armed with a gun. He had a dark-colored beard with some gray hair in it that showed underneath his mask. This robber demanded money from the bank's head teller, Carol Gribble, and placed approximately $29,825 in a bank bag with the bank's name and address imprinted on it. One of the $50 bills that was placed in the bag was a "bait bill," meaning that the bank had written down the bill's serial number for comparison in the event of a robbery. Garland testified that the robbers took the bank bag full of money and left through the bank's entrance. After the robbers left, Garland heard gunfire and saw that a man had been shot and was lying on the pavement outside the bank.

Carol Gribble testified that the two robbers had come into the bank yelling. She testified that the robber who had jumped over the teller window put his arm around her neck, demanded money, and placed a small handgun behind her head. She noted that the robbers took the $50 "bait bill," along with the bank bag which she identified in court. Joey Parrott testified that the robber who remained in the lobby was wearing a mask, coveralls and brown leather shoes, and that this robber pointed a gun at him.

Linda Mullinax, another bank employee, testified that she was at a teller station when the armed, masked men came into the bank. She said the man who jumped behind the teller window saw her lying on the ground, walked over to her and pointed his gun in her face. She noted that he was wearing what looked like a mechanic's suit.

Barbara Turner, a customer of the bank, arrived while the robbery was taking place. She testified that she parked next to a red pickup truck that had backed into a parking space. She said the driver of the truck wore a tan hat pulled down over his forehead. As she walked into the bank lobby, a man with a gun grabbed her purse and told her to get on the floor and not move or he would kill her.

Rachel Weeks, another bank customer, also arrived while the robbery was occurring. As she walked toward the bank, Weeks noticed a red truck parked in the parking lot adjacent to the bank. Weeks testified that the man in the truck tried to cover up his face. As she walked into the bank, a masked man pointed a gun at her and ordered her into the bank, where she lay on the floor.

Randall King, an enforcement officer with the Department of Transportation, arrived outside the bank to use the automatic teller machine just as the robbers were exiting the bank. He testified that one of the robbers was wearing a dark mask, dark shirt and dark pants. He also recalled that one of the men was carrying a small bag. He exchanged gunfire with the robbers and was shot in the right thigh.

Mark Polow was in the vicinity of the bank at the time it was robbed. While he was in his car, he heard gunshots and saw one man running out of the bank wearing a hat, a mask, and coveralls. The man was shooting at an officer. He then saw another man wearing coveralls and a mask come out of the bank shooting. Both men ran and got into a truck with a waiting driver. One of the men fired a shot at Polow. Polow gave police the truck's tag number, 19779.

Wilburn Dycus, a police officer with the Cohutta Police Department who had been dispatched to the scene, testified that he saw two men exit the bank and start shooting at King, the DOT enforcement officer. Dycus noted that one of the men was wearing camouflage coveralls, a mask, and a hat. This man lost the hat outside of the bank, and Dycus identified the hat at trial as the one the man was wearing.

Lieutenant Larry Bunch of the Whitfield County Sheriff's Department testified that soon after the robbery, he received a radio transmission to look out for an older model, burgundy pickup truck containing three men who had just committed a robbery. As he was driving, he noticed a truck matching the description carrying three men traveling behind him. Bunch pulled over and then gave chase to the truck. The men drove to the end of a dead-end road, at which

time they jumped out of the truck and started running through a field. Bunch testified that he never lost sight of the truck while giving chase. As the men exited the truck, he noticed that one was wearing camouflage coveralls while the other two were wearing blue coveralls and hats. The men ran into some woods in the direction of a nearby lake. The man wearing camouflage coveralls got caught in some barbed wire, allowing Bunch to apprehend him. Bunch testified that, while he was struggling to subdue this man, the man dropped the bank bag. Bunch identified this man at trial as Fortner. Pam Garland identified the coveralls Fortner was wearing when he was apprehended as those worn by the robber who had pointed the gun at her and Joey Parrott. Bunch testified that, after he apprehended Fortner, the other two men continued to run.

Lieutenant Wayne Willard of the Whitfield County Sheriff's Department heard Bunch's radio transmissions that he was chasing the pickup truck and that the truck stopped at the dead-end street near the lake. Willard further heard Bunch state that two of the men were running toward the lake near where he was located. Willard went down to the lake and saw two men coming out of a wooded area. He yelled to them, but they jumped into the lake and began swimming away from him. Willard testified that, after firing a warning shot, he jumped into the lake and swam after them. On the other side of the lake, Willard apprehended one of the men, who had gray hair and a gray beard and was wearing coveralls. At trial, Willard identified Hindman as the man he apprehended at the lake. Willard testified that the other man was wearing a black t-shirt and blue jeans.

A Whitfield County deputy sheriff testified that he took custody of Hindman from Willard. This deputy said that Hindman was wearing blue coveralls, and that a Winchester Luger nine-millimeter bullet was discovered in his pocket. At trial, Pam Garland, the bank branch manager, was shown the blue coveralls Hindman was wearing when he was apprehended and identified them as the coveralls worn by the robber who had jumped over the teller window with a gun.

Danny Headrick, another officer with the Whitfield County Sheriff's Department, testified that as he was walking along the lake, he heard a man walking through the bushes in some mud and water. He apprehended this man, whom he identified in court as Burnett, and stated that Burnett was wearing blue jeans and a black t-shirt and was dripping wet. When he was apprehended, Burnett said, "Okay, you've got me." Willard was shown a photograph of Burnett taken after he was caught and identified him as the man he had been chasing along with Hindman. Burnett's appearance had changed between the date of his arrest, when he had facial hair, and the date of trial, when he was clean-shaven.

An agent with the Federal Bureau of Investigation arrived at the scene of the defendants' capture and took possession of the bank bag and money. He testified that Wachovia's "bait bill" was found in the bank bag. Carol Gribble identified the bank bag at trial as the one that was stolen.

An agent with the Georgia Bureau of Investigation testified that Winchester Luger nine-millimeter shell casings were found outside the front entrance of the bank and in the bed of the pickup truck.

Perry Sisson testified that his 1965 Ford F110 red pickup truck, with license plate 19779, had been stolen on the day of the robbery. Sisson identified at trial the truck used in the robbery as his truck.

After the jury returned verdicts against all three defendants on the charges of armed robbery, aggravated assault, theft by taking, and possession of a firearm during the commission of a felony, defendants waived their right to jury trial on the charges of possession of a firearm by a convicted felon. The State then introduced evidence that each of the defendants had been convicted of previous felonies. The trial court convicted each defendant of the firearms charges and later adjudicated each defendant as a habitual felon pursuant to OCGA § 17-10-7.

1. The above evidence was clearly sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Hindman and Burnett were guilty of the crimes of armed robbery, theft by taking, and aggravated assault. See *Howard*, supra; *Jackson v. Virginia*, supra. Although defendants contend there was no evidence linking them to the crimes, there was overwhelming circumstantial evidence of such linkage. Hindman and Burnett were both apprehended after jumping into a lake to escape from police, in an area where the robbers were seen to have fled after exiting from the stolen getaway truck. With respect to Hindman, the coveralls he was wearing when he was apprehended were identified as those worn by one of the robbers. Spent shell casings matching the type of bullets fired during the robbery were found in the bed of the truck, and a matching bullet was found in Hindman's pocket. Accordingly, even apart from the circumstances surrounding his capture, there was strong evidence directly linking Hindman to the robbery.

Similarly, there was strong evidence establishing that Burnett was the third individual involved in the robbery. After the getaway vehicle was stopped, three men were seen exiting the vehicle and running from the police. When Fortner was apprehended, Hindman and the other individual continued to flee together. A short while later, Hindman and another man were spotted running together by Lieutenant Willard. The two men fled from Willard and jumped into a lake, even though Willard fired a warning shot in their direction. Upon reaching the opposite side of the lake, Hindman was appre-

hended by Willard, and Burnett, dripping wet, was apprehended by another officer. When he was caught, Burnett said, "Okay, you've got me." Willard identified Burnett as the individual he had been chasing along with Hindman. Accordingly, there was strong evidence that Burnett was one of the three men in the getaway vehicle. Because the coveralls worn by Hindman and Fortner were identified as those of the two gunmen, the jury was authorized to conclude that Burnett was the driver of the stolen getaway vehicle and thus a party to the crimes charged. See *Bell v. State*, 156 Ga. App. 190 (274 SE2d 153) (1980) ("The driver of a getaway vehicle who waits in the car while another commits a crime, starts the motor at the latter's approach, and drives precipitously away, speeding, running off the road to avoid obstacles, and failing to observe stop signs or calls to stop, may in the absence of convincing evidence to the contrary be found guilty as a party to the felonious conduct of his comrade.").

2. Burnett and Hindman assert that there was insufficient evidence to support their convictions of possession of a firearm, arguing that there was no evidence showing they were in possession of a firearm during the robbery. This contention is without merit. With respect to Hindman, Pam Garland, the branch manager of the bank, identified the clothing Hindman was wearing when he was arrested as being the clothing worn by the individual who jumped over the teller counter and threatened Carol Gribble with a gun. Accordingly, there was evidence from which the jury could have concluded that Hindman was in possession of a firearm during the robbery.

With respect to Burnett, although there may not have been evidence that he was in physical possession of a firearm during the robbery and its aftermath, the evidence authorized a finding that he was a party to the crime and that he and his co-defendants were joint conspirators. See *Coursey v. State*, 196 Ga. App. 135-136 (1) (395 SE2d 574) (1990); *Perkins v. State*, 194 Ga. App. 189, 190 (1) (390 SE2d 273) (1990). "The act of either was the act of the other and each is as fully responsible for the act of the other as if he had committed that act." *Coursey*, supra at 136. Accordingly, "[Burnett] may properly be convicted of possession of a firearm . . . on the ground that he was a party or aider or abettor to the offense." *Perkins*, supra. See also *Hamilton v. State*, 179 Ga. App. 434 (346 SE2d 881) (1986).

3. Each of the defendants contends there was a fatal variance between the indictment charging him with armed robbery and the evidence adduced at trial. In particular, defendants argue that the indictment failed to specify which Wachovia Bank in Whitfield County, Georgia, they allegedly robbed. This argument is without merit.

Defendants rely on *State v. Green*, 135 Ga. App. 622 (218 SE2d 456) (1975), in which we held that an indictment for burglary must

specify the location of the building in which the crime was committed. Unlike burglary, however, the particular location of the robbery is not an element of the offense of armed robbery. See OCGA § 16-8-41 (a) ("A person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon."). Accordingly, it is not necessary that the indictment specify the exact location in which the crime occurred, so long as it is alleged that the crime occurred within the county. See, e.g., *State v. Ramos*, 145 Ga. App. 301 (243 SE2d 693) (1978) (limiting *Green* to its facts and refusing to extend the holding therein to cases of theft by taking).

4. Each of the defendants asserts that the State's exhibits establishing his prior criminal convictions were improperly admitted at trial because they were not correctly authenticated pursuant to OCGA § 24-7-24. Because the exhibits were improperly admitted, defendants contend that their convictions for possession of a firearm by a convicted felon, as well as their life sentences pursuant to the recidivist statute, should be reversed. These contentions, too, are without merit.

With respect to State's Exhibits 116, 117, and 118, showing Hindman's prior convictions, the record does not reflect that Hindman's attorney objected to these documents on the grounds asserted in his brief. Accordingly, Hindman has waived the right to raise such objections on appeal. See *Hawkins v. State*, 230 Ga. App. 627, 629 (2) (497 SE2d 386) (1998); *Campbell v. State*, 228 Ga. App. 258, 263 (3) (b) (491 SE2d 477) (1997).

With respect to Burnett, the record reflects that Burnett's counsel did not object to State's Exhibits 119, 121, or 123 on the grounds of lack of authentication. These three exhibits related to prior convictions for armed robbery, habitual criminal, assault with intent to commit armed robbery, and felonious escape. The trial court expressly found that Burnett had been convicted of these felony offenses. As these prior convictions were sufficient to support Burnett's conviction for possession of a firearm by a convicted felon, his adjudication as a habitual felon, and his life sentence under the recidivist statute, it is unnecessary to consider whether State's Exhibits 120 and 122, relating to other convictions, were properly admitted. See OCGA § 17-10-7.

With respect to Fortner, the State introduced State's Exhibit 114, showing a prior conviction for armed robbery, and State's Exhibit 115, showing a conviction for attempt to commit larceny. The record clearly reflects that Exhibit 114 was properly authenticated. Although Fortner argues on appeal that the certification was improperly signed by a deputy clerk on behalf of the clerk of court, he did not

urge this specific ground below and therefore cannot raise it here. See *Hawkins*, supra. The trial court expressly found that Fortner had been convicted of the prior armed robbery. As this prior conviction was sufficient to support Fortner's conviction for possession of a firearm by a convicted felon, his adjudication as a habitual felon, and his life sentence under the recidivist statute, it is unnecessary to consider whether State's Exhibit 115 was properly admitted.

5. In several enumerations, defendants assert that OCGA § 17-10-7 (b) is unconstitutional because (1) it constitutes cruel and unusual punishment, (2) it violates their rights to due process under the Georgia Constitution, and (3) it requires retroactive punishment in violation of the ex post facto clause of the Georgia Constitution.

Defendants originally filed their appeals with the Supreme Court of Georgia. The Supreme Court concluded that "[w]hile the constitutional challenges that appellants seek to raise on appeal were raised before the trial court, the trial court neither explicitly nor implicitly ruled upon those challenges. Accordingly, those constitutional challenges have not been preserved on appeal." The Supreme Court thus transferred the appeals to this Court.

Although it is possible to argue that the trial court implicitly denied defendants' constitutional arguments, "we are bound to conclude under these circumstances that the transfer of the case by the Supreme Court to this court is a final determination that no constitutional question was in fact properly raised." (Punctuation omitted.) *Schmidt v. Feldman*, 230 Ga. App. 500, 502 (2) (497 SE2d 23) (1998). See also *Parker v. State*, 220 Ga. App. 303, 310 (7) (469 SE2d 410) (1996) ("Since these constitutional claims were not timely raised and ruled upon by the trial court, they conferred no jurisdiction upon the Supreme Court and present nothing for appellate review in this Court.").

Even if these constitutional claims had been properly preserved for appeal, these issues have previously been decided adversely to defendants. See *Ortiz v. State*, 266 Ga. 752, 753 (2) (470 SE2d 874) (1996) (OCGA § 17-10-7 (b) (2) does not violate prohibition against cruel and unusual punishment or deprive defendants of due process); *Campbell v. State*, 268 Ga. 44, 45 (1) (485 SE2d 185) (1997) (OCGA § 17-10-7 (b) does not impose unconstitutionally excessive punishment); *Johnson v. State*, 229 Ga. App. 400 (493 SE2d 926) (1997) (OCGA § 17-10-7 does not violate prohibition against ex post facto laws).

*Judgments affirmed. Pope, P. J., and Beasley, J., concur.*

DECIDED OCTOBER 16, 1998 — ▮▮▮▮▮▮▮▮

*Michael A. Corbin*, for appellant (case no. A98A1136).

*Mitchell & Mitchell, E. Neil Wester III, Gee G. Vaughn*, for appellant (case no. A98A1137).

*Coppedge, Leman & Ward, James T. Ward*, for appellant (case no. A98A1138).

*Kermit N. McManus, District Attorney*, for appellee.