A99A0883. HALL v. THE STATE.
(525 SE2d 759)

ANDREWS, Presiding Judge.

Dr. Edwin Hall, Jr., a psychologist, appeals after denial of his motion for new trial following his conviction, along with his co-defendant Rickie Lewis, of conspiracy to defraud the State (OCGA § 16-10-21), Medicaid fraud (OCGA § 49-4-146.1), and theft by taking (OCGA § 16-8-2).[1]

The conspiracy count alleged that Lewis and Hall

---

[1] The theft by taking count merged with the Medicaid fraud count.

beginning on or about March 1, 1994, and continuing through on or about April 3, 1995, did then and there, unlawfully, conspire and agree with another to commit the theft of money, property which belonged to the Department of Medical Assistance ("Medicaid"), an agency of the State of Georgia, and in furtherance of the conspiracy did perform the following overt acts. . . .

Lewis alone was alleged to have committed the overt acts of incorporating We Care Family Services in February 1994; recruiting children who were Medicaid recipients for services represented to the parents and guardians as day care, after school programs, tutoring, and counseling services; "on multiple occasions, caus[ing] fraudulent billings to be submitted to [Electronic Data Systems][2] for psychological services to these children that were not medically necessary and in excess of the number of psychological services that were actually provided"; and causing "Medicaid recipient files to be fabricated to show that psychological services were rendered on certain dates, when in fact the services were not rendered on those dates."

Overt acts were alleged to have been committed jointly by Lewis and Hall in their entering an agreement that Hall would "provide psychological services at We Care Family Services," applying for a Medicaid provider number to provide these services, and in accepting medical assistance payments from Medicaid, in "an amount greater than that to which they were entitled, for services billed by We Care Family Services."

Hall alone was alleged to have committed the overt act of, from April 11, 1994 through April 3, 1995, "provid[ing] psychological services to Medicaid recipients that were not medically necessary."

The Medicaid fraud count alleged that Lewis and Hall

beginning on or about May 2, 1994, and continuing through on or about April 3, 1995, did obtain for themselves medical assistance payments to which they were not entitled, and in an amount greater than that to which they were entitled, . . . by the following fraudulent scheme and device: the accused caused to be submitted on multiple occasions electronic billings to Electronic Data Systems, Inc., . . . for psychological services to Medicaid recipients at We Care Family Services, that were not medically necessary and in excess of the number of psychological services that were actually provided to the Medicaid recipients. . . .

---

[2] EDS was the fiscal agent of the Department of Medical Assistance for processing Medicaid claims and reimbursing the providers.

Viewed with all inferences in favor of the verdict, the evidence was that Lewis, who was not a psychologist, set up We Care Family Services, a nonprofit corporation, and was provided space by the Atlanta Housing Authority at Bankhead Courts and Hollywood Courts, two Atlanta public housing projects. Lewis represented to the Authority that We Care was a living skills program which used only private funding. Lewis and Pelham, one of We Care's employees, went throughout the apartment complexes handing out flyers stating that We Care would provide computer training, a GED program, tutoring and counseling. Although none of these services were covered by Medicaid, Lewis and Tracey Pelham signed up numerous families and obtained the Medicaid numbers for all of the individuals in these families. The parents believed that the children were being signed up for after school and summer programs, which, they were told, would be paid for if they received public assistance. A few mothers also attended some of the computer training and GED sessions.

Jones, who was employed by a substance abuse program, was approached by Lewis and asked to do Medicaid billing for We Care. He gave her a legal pad with three or four pages of names, Medicaid numbers, and birthdays listed and asked her to bill for those names. At that point, he did not have a provider number, and no dates of service were listed. Jones advised Lewis that a provider number and dates of service were necessary for billing. Asked what codes of service she should bill under, Lewis told her to use the same ones she used for the substance abuse program, but she would not. Later, Lewis returned with the list and advised her that Hall was working with the program and gave her Hall's provider number. Dates of service had also been added to the list, and Jones prepared the billing.

Hall was contacted by Lewis and became the psychologist for We Care in mid-April 1994, obtaining a Medicaid provider number for We Care locations.[3] He provided Lewis with his power of attorney to be used for We Care, and all Medicaid billing was done by Lewis or at Lewis' direction. We Care received its first Medicaid payment on May 2, 1994, and was deposited by Lewis in a bank account in his name, "d/b/a We Care Family Services, Inc." Lewis then wrote checks to Hall for half of the amount received. Hall's first payment was received on May 11, 1994.

Lewis back-billed Medicaid under Hall's provider number for $76,000 worth of services performed before Hall even began with We

---

[3] Hall also provided Medicaid-paid counseling services to two other groups, Referral Resources and Community Help & Counseling, as well as conducting a private practice in Dunwoody.

Care, and Hall received half of that amount.[4]

Jones only did the billing for Lewis for a short time, after which Lewis did the billing. After she quit in June 1994, she telephoned Hall and advised him of the back-billing and the codes Lewis had wanted her to use. Hall's only response was that he had his own format and codes. Although Jones did not tell Lewis she had called Hall, Lewis telephoned Jones several weeks after the call, called her an obscene name, and threatened to sue her for slander.

After Hall began work with We Care in April 1994 and until January 1995, Pelham, employed by We Care, assisted him. While Pelham had an undergraduate degree in psychology and had some teaching experience, she was not a psychologist or specifically trained in psychological testing. Medicaid policies and procedures allowed for "auxiliary personnel" employed by a clinic or doctor's office to conduct psychological evaluation and testing, but only under the direct supervision of a licensed psychologist. Psychotherapy, either group or individual, was to be conducted only by a licensed psychologist enrolled in the Medicaid program.

Pelham, however, prepared the paperwork for the files maintained for the children involved with We Care. She prepared an intake sheet and filled out the mental status examination and checklist forms. She was provided with a copy of the Diagnostic & Statistical Manual of Mental Disorders by Hall, and, in the fall of 1994, Hall gave Pelham and other lay workers with We Care a list of the most commonly diagnosed disorders with the appropriate codes for billing. All children involved were given a diagnostic code, although the parents were unaware of this. Also, the only psychological testing done was performed by Pelham without oversight by Hall. The majority of the tests were not scored and, therefore, were unusable for therapeutic purposes.

Groups of children were periodically gathered together by Pelham, Terika Ford, and Gwendolyn Marshall, also lay employees of We Care, for group therapy sessions. Hall attended these sessions only sporadically initially and did not enter any notes in the files. All note taking was done by Pelham, Ford, and Marshall. None of these women were trained or had any experience in this area. As Hall acknowledged, he instructed Pelham, Ford, and Marshall regarding note taking. He testified that it was not complex to be "able to follow these kind of cookbook directions in order to generate ongoing ses-

---

[4] Although Hall argues that Medicaid procedures allow a provider to bill for services rendered up to six months previously, there is no evidence that Medicaid allows one provider to bill for services perhaps provided by another provider. Hall contended that maybe Lewis was billing under Hall's Medicaid provider number for services previously rendered by his predecessor psychologist, Dr. Lineberger.

sion notes." Hall further acknowledged that, because Lewis maintained custody of these files, he never consulted or reviewed them. During these group sessions, described by various participants as "rap sessions," the children had snacks, received minimal computer instruction, played, watched videos or just talked.

After another We Care employee was arrested by Georgia Bureau of Investigation agents in connection with a separate investigation, Hall and Lewis told We Care employees that it was very important that the files be up-to-date because the GBI was going to come for them. Hall told Pelham and others that the files had to be "up-to-date and up to par. It was very, very important that everything had to be matched into the files. . . . What they [Medicaid] was billed for had to match what was in the files." Lewis told the women they would have to work all weekend on the files, and they did. Hall told them he had to go out of town and was not present when the files were supplemented. Lewis produced the billing sheets, and the women wrote out "session notes" for the files that matched what was billed. Pelham and Ford both testified they made up the notes.

After working all weekend on the files, Pelham told Hall that she was concerned about the situation. He told her he would try to regulate it and not to worry.

From May 1994 until April 1995, We Care was paid, under Hall's provider number, $538,920.41 by 42 separate checks which combined numerous billings. This was only a portion of the total of $1,103,449.53 which was billed by We Care. The primary code given as a reason for nonpayment was that the number of contacts billed for a patient exceeded those allowed by Medicaid for one year.

The session supplementing the case files for the children occurred after Hall had been interviewed on September 24, 1994, by Investigator Pitts from the Georgia Department of Medical Assistance. While investigating another provider, Pitts received information that, over a 15-month period, Hall had received over $808,332.43 in payments for the three Medicaid provider numbers issued to him, including We Care.

Hall acknowledged that his "personal case file notes," which he maintained separately from the case files, only originated in January 1995, after the investigation began. Hall nonetheless maintained during the trial that he did not know the claims filed by Lewis were being exaggerated.

Dr. John Currie, the State's expert witness, testified that group counseling is most often appropriate for children nine years old or older, but may be done with exceptionally bright six-year-olds. At least a third of the 143 case files he examined were for children three years old or younger, including some only months old. Additionally,

Dr. Currie found testing instruments present in a large majority of the files, including some infants, but they were not scored. Most of the language used in the files he examined was basically the same. In his opinion, of the files he examined, 75 percent of those diagnosed with a mental disorder should not have been. One hundred twelve of the 143 files reflected no complaint of the child having any mental illness.

1. Hall's first two enumerations are that the court erred in failing to adequately charge the jury on "unanimity" to alleviate the dangers of duplicity and in failing to give his Request to Charge No. 15 on the issue. They are considered together.

OCGA § 16-1-7 (a) (2) prohibits multiple prosecutions, including the defect of duplicity.

> "An accusation is duplicitous if it joins 'separate and distinct offenses in one and the same count.' (Cit.) 'Duplicity' is 'the technical fault in . . . pleading of uniting . . . two or more offenses in the same count of an indictment. . . .' (Cit.)" *Peters v. State*, 175 Ga. App. 463, 465 (1) (333 SE2d 436) (1985) (overruled on other grounds, *Hogan v. State*, 178 Ga. App. 534, 535 (343 SE2d 770) (1986)).

*State v. Boyer*, 270 Ga. 701, 703 (2) (512 SE2d 605) (1999).

If an indictment is duplicitous, it is subject to demurrer. *State of Ga. v. Williams*, 247 Ga. 200, 202-203 (2) (275 SE2d 62) (1981). While Hall filed a special demurrer below, its premise was that all three of the separate counts "allege the same conduct," and therefore, the accused could not be subjected to multiple punishments. This is a different issue from that presented here. Further, at the hearing on the demurrer, Hall abandoned his request for a specific ruling on the demurrer and merely requested that the court reserve the issue of duplicity until trial. Therefore, nothing is presented here for our determination regarding either the validity of the ground contained in the demurrer or, as a basis for demurring, the argument made here.[5] *McKay v. State*, 234 Ga. App. 556, 558 (2) (507 SE2d 484) (1998); *Gatlin v. State*, 18 Ga. App. 9 (6) (89 SE 345) (1916).

Hall's Request to Charge No. 15 was that

> [t]he indictment alleges a number of acts between March of 1994 through March of 1995. In order to find a defendant

---

[5] We note that, in *Johnson v. State*, 233 Ga. App. 450-451 (1), (2) (504 SE2d 290) (1998), this Court rejected a challenge by demurrer to an indictment which alleged one count of theft by deception based on four separate invoices as part of a scheme to obtain money under false pretenses.

> guilty, each juror must agree with each of the other jurors unanimously that the same act was, in fact, engaged in or employed by the defendant Hall in committing the crimes charged in Counts 1 through 3 of the indictment. Unless the government unanimously proves to your satisfaction the same means or method to each of you, beyond a reasonable doubt, you must acquit the defendant of the crimes charged in Counts 1 through 3 of the indictment.

The argument made focused on the fact that Lewis submitted a total of 4,761 claims on 42 separate occasions for 301 Medicaid recipients. Hall contends, apparently, that all the jurors were required to agree that a specific claim submitted was one to which We Care was not entitled or was for more than We Care was entitled in order to prove conspiracy and Medicaid fraud and that his requested charge was necessary in this regard. Acknowledging that there is no Georgia authority on the issue, Hall relies on two federal cases[6] in support of his argument. These cases are of persuasive value only and not binding on this Court. *Felker v. State*, 252 Ga. 351, 361 (1) (314 SE2d 621) (1984).

"In order for a refusal to charge to be error, the request must be entirely correct and accurate, and adjusted to the pleadings, law, and evidence, and not otherwise covered in the general charge. [Cit.]" (Punctuation omitted.) *Ogles v. State*, 218 Ga. App. 92, 93 (1) (c) (460 SE2d 866) (1995).

Regarding the conspiracy charge, the request is inapposite because Hall could be convicted of conspiracy even if acquitted of the theft by taking and Medicaid fraud charges and even if the jury did not believe that Hall had committed the one overt act which he independently was alleged to have committed, as long as one act by Lewis was proven to the jury's satisfaction. *Thomas v. State*, 215 Ga. App. 522, 523 (451 SE2d 516) (1994); see *English v. State*, 202 Ga. App. 751, 752 (1) (415 SE2d 659) (1992).

Further, Hall acknowledged that he did two of the overt acts alleged to have been jointly committed by him and Lewis, i.e., providing services at We Care and obtaining a Medicaid provider number.

We next consider the Medicaid fraud count, which was alleged to have been committed by submitting billings for services that were "not medically necessary and in excess of the number of psychological services that were actually provided. . . ."

Hall acknowledges that, when a crime may be committed in more than one way, it is permissible to incorporate the different

---

[6] *United States v. Fawley*, 137 F3d 458 (7th Cir. 1998); *United States v. Holley*, 942 F2d 916 (5th Cir. 1991).

methods in one count, conjunctively, as was done here. *Lumpkins v. State*, 264 Ga. 255 (1) (443 SE2d 619) (1994); *Robinson v. State*, 143 Ga. App. 37, 39 (3) (237 SE2d 436) (1977).

The crux of the charge of Medicaid fraud is the scheme to defraud pursuant to which money was received. In this respect, the crime is more similar to federal mail and wire fraud violations than to the perjury charges at issue in *United States v. Holley*, 942 F2d 916 (5th Cir. 1991), and *United States v. Fawley*, 137 F3d 458 (7th Cir. 1998), relied upon by Hall, and we do not find these cases persuasive.

Here, the court thoroughly explained the elements of the crimes charged, the indictment was read to the jury at least twice and was with them during their deliberations, and the court instructed that "whatever your verdict is, it must be unanimous. That is, agreed to by all of you." This is the suggested pattern charge as compiled by the Council of Superior Court Judges of Georgia, and, as recently held by the Supreme Court, "[w]hen a legal issue involves such well-established principles as the definition of reasonable doubt, there are few, if any, circumstances which would justify a trial court's failure to use the suggested pattern criminal charges. . . ." *Coleman v. State*, 271 Ga. 800, 805 (523 SE2d 852) (1999). We believe this likewise applies to the charge dealing with the need for unanimity.

Because, as discussed above, Hall's requested charge was not "correct, legal, apt, and precisely adjusted" to the conspiracy charge, there was no abuse of discretion in the court's not giving it with regard to the Medicaid fraud charge. " 'If *any portion* of the request is inapt or incorrect, denial of the request is proper.' (Emphasis in original.) *Smith v. State*, 209 Ga. App. 540, 544 (5) (433 SE2d 694) (1993)." *Duncan v. State*, 213 Ga. App. 394, 397 (6) (444 SE2d 583) (1994).

2. Hall's third enumeration is that the court erred in denying his motion for directed verdict on the ground of the statute of limitation.

Although Hall filed a plea in bar based on OCGA § 17-3-1 (c), the four-year statute of limitation, during the pretrial hearing on the issue, he requested that the court reserve the issue for trial, which was done.

> On appeal the evidence must be viewed in the light most favorable to support the verdict, and [Hall] no longer enjoys a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility. The standard for reviewing a denial of a motion for a directed verdict of acquittal is whether under the rule of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979), the evidence was sufficient for a rational trier of fact to find beyond a rea-

sonable doubt that the defendant was guilty of the charged offense. Moreover, the test established in *Jackson* is the proper test for us to use when the sufficiency of the evidence is challenged, whether the challenge arises from the overruling of a motion for directed verdict or the overruling of a motion for new trial based upon alleged insufficiency of the evidence.

(Citations and punctuation omitted.) *Lester v. State*, 226 Ga. App. 373, 376 (2) (487 SE2d 25) (1997).

Here, the indictment was returned on June 29, 1998, and alleged that the crimes occurred between February 2, 1994 and April 3, 1995, but were unknown to the State until September 28, 1994, when Investigator Pitts spoke to Hall. Therefore, the statute was tolled until that time pursuant to OCGA § 17-3-2 (2), which provides that the limitation period does not include time during which "the crime is unknown." The knowledge at issue is that of the State, including "that imputed to the State through the knowledge not only of the prosecution, but also includes the knowledge of someone interested in the prosecution, or injured by the offense. [Cits.]" (Punctuation omitted.) *Greenhill v. State*, 199 Ga. App. 218, 221 (6) (404 SE2d 577) (1991).

Hall acknowledges that such an issue is appropriate for jury consideration, as he requested. *State v. Tuzman*, 145 Ga. App. 481, 482 (2) (243 SE2d 675) (1978). Viewed under the standard set out above, the evidence showed that the victim was the Department of Medical Assistance. Pitts was investigating another psychologist for Medicaid fraud when he became aware that there were questions regarding Hall. While Hall contended that EDS had all the information necessary to know about the crime, the EDS representative testified that EDS did not audit the claims, but merely processed them. EDS knew nothing about We Care or the types of services being rendered.

It was only when Pitts interviewed Dr. Hall on September 28, 1994, that Pitts became aware that the number of client contacts necessary to have billed the amounts Hall billed was not possible and the investigation began in earnest. There was sufficient evidence from which the jury could decide that this was the first knowledge of the crime, and there was no error in denying the motion for directed verdict on this ground.

3. Hall's final enumeration is that the trial court erred in admitting confidential patient records into evidence without first requiring the State to properly authenticate them or to lay an adequate foundation.

The objection made below was that "[t]hey have not been authenticated. There has not been an adequate foundation laid and we

object." There was no argument or objection made below on the confidentiality of those files, and this argument will not be considered here for the first time. *Hindman v. State*, 234 Ga. App. 758, 764 (4) (507 SE2d 862) (1998).

Also, no argument is made here regarding lack of foundation, and we do not consider this. Further, we note that, when the objection was made below, there was no statement of what the proper foundation would be, presenting nothing for appeal. *Adams v. State*, 264 Ga. 71, 74 (4) (440 SE2d 639) (1994).

We consider the argument that the records were not properly authenticated. GBI Agent Garner testified that, pursuant to a subpoena issued to Lewis, Lewis' former attorney, Cook, provided her with 143 of the specified 145 recipient files subpoenaed. Service logs and group rosters were also turned over by Cook to Garner.

Garner testified that these files were specified in the subpoena because they were for the recipients for whom We Care billed the largest amounts of money from Medicaid.

Authenticity may be shown by circumstantial evidence. *State v. Smith*, 246 Ga. 129, 130 (269 SE2d 21) (1980); *Martin v. State*, 135 Ga. App. 4, 7 (3) (217 SE2d 312) (1975).

Here, Lewis' attorney turned the records over to the State; Hall acknowledged that he told Pelham, Ford, and Marshall how to take notes for the files and that all the files were maintained by Lewis; Pelham testified that she prepared most of the paperwork in the files; Pelham and Ford both testified that they helped falsify the records; and Hall did not dispute that Lewis had fabricated and inflated claims, only that he was not aware of it.

There was sufficient evidence to make a prima facie case of authenticity, and there was no error. *Smith*, supra; *Weathers v. State*, 198 Ga. App. 871, 872 (403 SE2d 449) (1991).

*Judgment affirmed. McMurray, P. J., and Ruffin, J., concur.*

DECIDED NOVEMBER 19, 1999 — ▮▮▮▮▮▮▮

*Chilivis, Cochran, Larkins & Bever, Anthony L. Cochran, James D. Durham*, for appellant.

*J. Tom Morgan, District Attorney, Thurbert E. Baker, Attorney General, Doris Williams-McNeely, Harrison W. Kohler, Assistant Attorneys General*, for appellee.