**SECOND DIVISION**
**MARKLE, J.,**
**LAND and DAVIS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. https://www.gaappeals.us/rules**

**January 23, 2025**

# In the Court of Appeals of Georgia

A24A1486. TAYLOR v. THE STATE.

DAVIS, Judge.

Following a jury trial, Jimmy Taylor was convicted of forty-four counts of exploitation of an elder person, twenty-two counts of practicing medicine without a license, one count of attempting to practice medicine without a license, and one count of driving with a suspended license. Taylor appeals from his convictions and sentence and the denial of his motion for new trial. For the reasons set forth below, we affirm Taylor's judgment and sentence and the denial of his motion for new trial.

Viewed in the light most favorable to the verdict,[1] the evidence at trial showed the following. In May 2017, Annette Johnson was 75 years old and developed a

---

[1] See *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

malignant melanoma on her foot. Taylor, despite not having a license to practice medicine, held himself out to Johnson as a licensed physician and told her that he could treat her cancer. Once every two weeks, Taylor went to Johnson's home, administered purported stem cells and chemotherapy, and gave her other purported medicine, and she paid him for the purported treatment. Johnson's condition significantly deteriorated throughout Taylor's purported treatment — despite him assuring her that it was working — and when she eventually sought treatment from licensed physicians in an April 2018 visit to an emergency room, her cancer had spread throughout her entire body. Shortly thereafter, Johnson entered hospice care and passed away.

After Johnson's admission to the hospital, law enforcement learned about Taylor's activities and his next scheduled appointment with Johnson, and a police officer made contact with him upon his arrival at her home. Taylor initially told the officer that he was a licensed physician in Georgia and was there to treat Johnson, but he later admitted that he was not licensed in Georgia or the United States, and the officer discovered that his driver's license was suspended, searched his vehicle, found

numerous apparent medical supplies, and arrested him. Officers later searched

Taylor's residence and found a large quantity of medical supplies and medicine.

Taylor was charged by indictment with forty-four counts of exploitation of an

elder person (OCGA § 16-5-102 (a)), twenty-two counts of practicing medicine

without a license (OCGA § 43-34-22), one count of attempting to practice medicine

without a license (OCGA § 16-4-1), and one count of driving with a suspended license

(OCGA § 40-5-121 (a)). Taylor proceeded pro se at trial. The jury found Taylor guilty

of all charges, and the trial court sentenced him to a total of 203 years in prison.

Taylor filed a motion for new trial, claiming, inter alia, that the trial court failed

to sufficiently advise him of his right to counsel. The court denied the motion

following a hearing. In rejecting Taylor's claim that the court failed to advise him of

his right to counsel, the court found that he declined other appointed counsel once his

public defender withdrew from representation and that he acknowledged his

understanding of his rights to counsel and to self-representation. This appeal

followed.[2]

_____

[2] Taylor directed his appeal to the Supreme Court of Georgia, which transferred it here.

3

1. First, Taylor argues that under *Faretta v. California*, 422 U. S. 806 (95 SCt 2525, 45 LE2d 562) (1975), the trial court failed to take the necessary steps to ensure that he fully understood his right to counsel, his right to have counsel appointed to represent him if he could not afford it, and the dangers posed by representing himself. We disagree.

"Both the federal and state constitutions guarantee a criminal defendant both the right to counsel and the right to self-representation." *Wiggins v. State*, 298 Ga. 366, 368 (2) (782 SE2d 31) (2016). Under *Faretta*,

> [i]f a defendant makes a pre-trial, unequivocal assertion of the right to self-representation, the request must be followed by a hearing to ensure that the defendant knowingly and intelligently waives the traditional benefits associated with the right to counsel and understands the disadvantages of self-representation so that the record will establish that he knows what he is doing and his choice is made with eyes open.

(Citation and punctuation omitted.) Id. "Each case must be evaluated on its own unique facts and circumstances, and there is no magic language that the trial court must use to determine whether a waiver of counsel is valid." (Citation omitted.) *Stinson v. State*, 352 Ga. App. 528, 531 (1) (a) (835 SE2d 342) (2019); see also *McDaniel v. State*, 327 Ga. App. 673, 674 (1) (761 SE2d 82) (2014) ("The

4

determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.") (citation omitted). "The record should reflect a finding by the trial court that the defendant has elected to proceed pro se and should show that this choice was made after the defendant was made aware of his right to counsel and the dangers of proceeding without counsel." (Citation omitted.) *Stinson*, supra, 352 Ga. App. at 531 (1) (a). "Although the State has the burden of showing that a defendant received sufficient information and guidance from the trial court to make a knowing and intelligent waiver of the right to trial counsel, a trial court's ruling on this issue is reviewed only for an abuse of discretion." (Citation omitted.) *Wright v. State*, 356 Ga. App. 597, 600-601 (2) (848 SE2d 467) (2020).

Taylor was initially represented by a public defender who withdrew from representation after he filed a lawsuit in federal court against his public defender and the public defender's office. Taylor declined other appointed counsel and obtained private counsel, who eventually withdrew from representation because he was not

cooperating in his defense. Taylor subsequently filed a bevy of pro se motions, including a motion to proceed pro se.

At a pre-trial hearing, the trial court, after stating that "we've had this discussion repeatedly over the years, but I need to revisit it for the record," asked Taylor whether he wished to represent himself, and he responded affirmatively. Taylor again responded affirmatively when the court asked whether he had "indicated to me on a prior occasion, after a rather lengthy discussion, . . . that you are aware of the risks of representing yourself." Taylor confirmed his understanding that he was waiving any right to appeal based on ineffective assistance of counsel and that the court would hold him to the same standard as an attorney in terms of "knowing the rules of evidence or procedure or what have you." Taylor reiterated that he wished to represent himself. Taylor stated that he had "a doctorate in chiropractic," "a degree in medicine," "a Master of Science in law," and "a Ph.D. in physiology." The court granted Taylor's motion to proceed pro se, stating that he had a constitutional right to represent himself if he wished to do so.

Before the commencement of trial, the trial court stated that Taylor was representing himself at his request and that "[w]e have had the *Faretta* discussion on

more than one occasion," and Taylor confirmed that he still wished to represent himself. The court advised Taylor that representing himself was "a bad idea" and that it could not tell him "how to do things properly, because then I give the impression to the jury that I am helping one side or the other, and that's not my role. My role is to make [the defense and the State] play by the rules." The court further advised Taylor that if it sustained an objection to his evidence, it could not tell him how to properly introduce the evidence.

After Taylor stated that he understood the trial court's warnings, the following exchange occurred:

TAYLOR: [I]f I decided not to defend myself, and I could not afford an attorney, would a public defender defend me that you appointed?

COURT: But this is a game, Mr. Taylor. . . . I've been trying to get this case to trial for four years. And so this morning you're going to ask for a lawyer, and you're grinning at me because you know it's a game. We've flown witnesses in from out-of-state, and you have — are you telling me you want to have a lawyer now?

TAYLOR: I was asking a question.

COURT: . . . I don't answer rhetorical questions because what you are doing, in my opinion, is playing games to create an appellate record. And

what you need to understand is, number one, you can't create ineffective assistance of counsel by representing yourself. So are you telling me you want a lawyer or not?

TAYLOR: I don't want a lawyer, Your Honor.

COURT: You're going to represent yourself? All right.

The trial court conducted yet another inquiry as to whether Taylor desired to represent himself and stated that because he had been representing himself "for a while," it was "appropriate to make a record that [he was] choosing to do that." Taylor confirmed his understanding that he had a constitutional right to represent himself but was not required to do so, that the court could not "help" him, and that "self-representation is seldom wise." Taylor acknowledged that he and the court had engaged in similar discussions regarding self-representation "on other occasions over the years." Taylor again confirmed that he wished to exercise his right to represent himself.

Applying the principles established in *Faretta* and its progeny to the facts of this case, we conclude that the trial court did not abuse its discretion in concluding that Taylor knowingly and intelligently waived his right to counsel. Taylor made an

unequivocal assertion of the right to self-representation, and he was aware of his right to counsel and his right to appointed counsel if he could not afford it, as he had been represented by a public defender and declined other appointed counsel once the public defender withdrew. Later, Taylor demonstrated his understanding of these rights by purporting to ask the trial court whether a public defender would be appointed to represent him if he desired counsel but could not afford it.[3] And the court's extended and repeated warnings to Taylor about the dangers of proceeding pro se were obviously based on the concept that he had a right to counsel.

---

[3] Taylor claims that the court's response to his purported question was improper because it gave the impression that he would not be given an opportunity to be represented by counsel even if he insisted. We disagree, as Taylor confirmed that he did not want an attorney even after asking the question, and we will not disturb the court's finding that the question was an inappropriate tactic by Taylor to delay the trial. See *Stinson*, supra, 352 Ga. App. at 535 (2) ("In considering a post-waiver request for counsel, a trial court may consider, among other things, the timing of the request. As the trial date draws nearer, the trial court can and should consider the practical concerns of managing its docket and the impact that a request may have on its general responsibilities for the prudent administration of justice.") (citation omitted); *Brooks v. State*, 243 Ga. App. 246, 250 (1) (a) (iii) (532 SE2d 763) (2000) ("[A defendant's] right to counsel is not superior to the [S]tate's right to try him for the criminal offenses and does not include the right to manipulate, whether consciously or capriciously, the [S]tate's attempt in good course to prosecute him for the offenses.") (citation omitted).

9

Considering Taylor's awareness of his right to counsel and his right to appointed counsel if he could not afford it, his apparently advanced education, and the trial court's warnings that he would be held to the same standard as an attorney and that it could not help him with his defense, the court did not abuse its discretion in concluding that he knowingly and intelligently waived his right to counsel. See *Wilkerson v. State*, 286 Ga. 201, 203 (2) (a) (686 SE2d 648) (2009) (trial court's colloquy demonstrated that defendant made a knowing and intelligent waiver of his right to counsel, where court explained the dangers of self-representation and defendant stated he understood those dangers); *Stinson*, supra, 352 Ga. App. at 532 (1) (a) (upholding trial court's finding that defendant knowingly and voluntarily waived his right to counsel, where defendant was a high school graduate with some college education, court advised defendant of the potential consequences of proceeding pro se and that he would be responsible for preparing and making strategic decisions for trial, and defendant told court he still wanted to represent himself); cf. *Stewart v. State*, 361 Ga. App. 636, 641-642 (2) (a) (865 SE2d 237) (2021) (defendant did not knowingly and voluntarily waive his right to counsel, where his course of conduct leading up to trial raised serious doubts that he expressed an intentional and

voluntary decision to waive the right, and when it finally became clear on the morning of trial that he did not have counsel, the trial court failed to hold a *Faretta* hearing or have a discussion with him to make sure that he was aware of the benefits associated with the right or the disadvantages of self-representation).

2. Next, Taylor argues that the trial court erred in not providing him a meaningful opportunity to object to the introduction of the State's exhibits at trial, and he specifically challenges the court's failure to ask whether he had any objections to the exhibits. This argument lacks merit.

A review of the trial transcript shows that when the State moved to tender an exhibit, it showed the exhibit to Taylor, who remained silent, and the trial court admitted the exhibit. Taylor does not cite, and we have not found, any authority requiring a court to ask a defendant if he has an objection to the State's exhibits. Indeed, "standard practice in Georgia has long required *a party* to make and obtain a ruling on an objection to evidence in the trial court, before or as the evidence is admitted, in order to preserve the objection for appeal." (Citation omitted; emphasis supplied.) *Everett v. State*, 318 Ga. 697, 703 (3) (899 SE2d 699) (2024). And the court's mere failure to ask Taylor if he had an objection does not establish that it

11

prevented him from objecting. There is a "presumption in favor of the regularity and legality of all proceedings in the trial court. We will not presume error from a silent record." (Citation omitted.) *Nix v. State*, 354 Ga. App. 47, 58 (8) (839 SE2d 687) (2020). Significantly, Taylor demonstrated the ability to object to certain questions and comments at other points during the State's presentation of testimony and argument to the jury, even when the court did not ask if he had an objection. Accordingly, Taylor has not shown that the court erred in preventing him from raising objections to the State's exhibits.[4]

3. Taylor further argues that the trial court erred in failing to hold a hearing or rule on his motions to dismiss and to quash the indictment. This argument is belied by the record, as the court held a pre-trial hearing on these motions and orally denied them.

4. Lastly, Taylor argues that the indictment was defective in two respects. We conclude that Taylor's first challenge to the indictment lacks merit and that his second challenge has been waived.

---

[4] We also note that Taylor does not raise any challenge to the admissibility of the exhibits, and generally "to be successful, a claim of error requires a showing of both harm and error." *Dailey v. State*, 313 Ga. App. 809, 816 (1) (723 SE2d 43) (2012).

(a) First, Taylor argues that the indictment was multiplicitous and violated his protection against double jeopardy because it alleged a single and continuous offense — falsely holding himself out to Johnson as a licensed physician, and practicing medicine upon her without a license — as an offense multiple times.[5] Taylor further argues that all of the charges of exploitation of an elder person should have merged at sentencing because they were proven with the same facts, and all of the charges of practicing medicine without a license should have merged at sentencing because they were proven with the same facts.[6]

---

[5] Although Taylor also argues that the indictment was duplicitous, it is apparent that his real argument is that the indictment was multiplicitous, as his argument is based on the assertion that the indictment alleged a single and continuous offense as multiple offenses. "Multiplicity is the charging of the same crime in several counts of a charging document." (Citation omitted.) *Chancey v. State*, 256 Ga. 415, 433 (7) (349 SE2d 717) (1986). "[D]uplicity means, not alleging the same transaction in varying ways by means of separate counts, but in alleging more than one theory or version of the transaction in a single count." *Strauss v. State*, 113 Ga. App. 90, 92 (2) (147 SE2d 367) (1966); see *Hall v. State*, 241 Ga. App. 454, 459 (1) (525 SE2d 759) (1999) (whether three separate counts alleged the same conduct was a different issue from whether the indictment was duplicitous).

[6] While the State claims that Taylor waived his merger arguments by failing to raise them below, a waiver analysis is unnecessary because "we have the discretion to correct merger errors sua sponte." (Citation and punctuation omitted.) *Hawkins v. State*, 350 Ga. App. 862, 876 (9) (830 SE2d 301) (2019).

"Merger" refers generally to situations in which a defendant is prosecuted for and determined by trial or plea to be guilty of multiple criminal charges but then, as a matter of substantive double jeopardy law, can be punished — convicted and sentenced — for only one of those criminal charges. A unit-of-prosecution analysis, which requires careful interpretation of the criminal statute at issue to identify the unit of prosecution — the precise act or conduct that the legislature criminalized, should be applied to determine whether multiple counts of the same crime merge.

(Citations, punctuation, and emphasis omitted.) *State v. Shropshire*, 318 Ga. 14, 16 (2) (896 SE2d 541) (2023).[7] "When a defendant enumerates a merger error after being convicted of multiple counts of the same crime, the correct merger analysis requires courts to ask whether those crimes arose from a single course of conduct and, if so, whether the defendant can face multiple convictions and sentences under a unit-of-prosecution analysis." (Citation, punctuation, and emphasis omitted.) *Johnson v.*

---

[7] "[T]he doctrine of substantive double jeopardy — concerned as it is with multiple convictions and sentences — does not come into play until after the defendant has been found guilty on multiplicitous counts." (Emphasis omitted.) *Williams v. State*, 307 Ga. 778, 780 (1) (838 SE2d 235) (2020). "Procedural protections against double jeopardy apply only to multiple prosecutions, meaning multiple or successive indictments or criminal proceedings. These procedural protections do not apply to a single indictment that contains multiple counts, even if those counts are deemed multiplicitous." (Citation omitted.) *Dukes v. State*, 311 Ga. 561, 570 (4) (858 SE2d 510) (2021).

*State*, 313 Ga. 155, 159 (4) (868 SE2d 226) (2022). "[W]here one crime is completed before another crime, the same conduct does not establish the commission of both offenses." (Citation and punctuation omitted.) *Eleby v. State*, 319 Ga. 234, 248 (7) (903 SE2d 64) (2024). "Whether offenses merge is a legal question, which we review de novo." (Citation omitted.) *Womac v. State*, 302 Ga. 681, 684 (3) (808 SE2d 709) (2017).

> The Legislature has the power to authorize multiple criminal convictions or punishments arising out of the same act or transaction. Because the Legislature has the power to define crimes and fix punishments, the protection against double jeopardy is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.

(Citations and punctuation omitted.) *Nolley v. State*, 335 Ga. App. 539, 545 (2) (782 SE2d 446) (2016). "The Double Jeopardy Clause imposes few limits upon the legislature's power to define offenses. Whether a particular course of conduct involves one or more distinct offenses under the statute depends on this legislative choice." (Citation and punctuation omitted.) *Scott v. State*, 356 Ga. App. 152, 155 (5) (846 SE2d 241) (2020). "[T]he text of the statute itself best reflects that legislative choice. It is the General Assembly's exclusive role to determine to what extent certain

criminal conduct has demonstrated more serious criminal interest and damaged society and to what extent it should be punished." (Citations and punctuation omitted.) Id. "Because it is the task of the legislature, not the courts, to define crimes and set the range of sentences, the determination of whether a course of conduct can result in multiple violations of the same statute is a matter of statutory interpretation." (Citation and punctuation omitted.) *State v. Williams*, 347 Ga. App. 183, 184 (818 SE2d 256) (2018).

> [I]n considering the meaning of a statute, our charge as an appellate court is to presume that the General Assembly meant what it said and said what it meant. . . . [T]he ordinary signification shall be applied to all words. Where the language of a statute is plain and susceptible to only one natural and reasonable construction, courts must construe the statute accordingly. Criminal statutes are construed strictly against the State, they must be read according to the natural and obvious import of their language, and their operation should not be limited or extended by application of subtle and forced interpretations.

(Citations omitted.) *Scott*, supra, 356 Ga. App. at 157 (5). We must also "afford the statutory text its plain and ordinary meaning, consider the text contextually, and read the text in its most natural and reasonable way, as an ordinary speaker of the English language would." (Citation omitted.) *Austin v. State*, 356 Ga. App. 839, 844-845 (3)

(849 SE2d 689) (2020). "Finally, we are also mindful of our duty to construe statutes to give sensible and intelligent effect to all of their provisions and to refrain from any interpretation which renders any part of the statutes meaningless." (Citation omitted.) Id.

(i) We conclude that Taylor's 44 convictions for exploitation of an elder person did not merge for sentencing purposes.

The first 22 counts of exploitation of an elder person in the indictment alleged that on 22 dates between May 2, 2017, and March 28, 2018, Taylor exploited Johnson's financial resources by means of false pretense in that he falsely represented himself as a doctor who could treat her illness in order to collect fees for treatment. The next 22 counts of this offense alleged that on the same 22 dates, Taylor deprived Johnson of the essential service of medical treatment by holding himself out as a doctor for the treatment of her ailment, providing purported treatment through supposed stem cell therapy while her condition worsened, and collecting fees for treatment. Taylor's first and second set of 22 convictions for this offense were premised on the same course of conduct, as each set was based on the same instances where Taylor provided purported treatment for Johnson's cancer and collected fees

17

for such treatment.[8] Thus, we must address whether Taylor may face multiple

convictions and sentences under a unit-of-prosecution analysis. See *Johnson v. State*,

364 Ga. App. 749, 752-753 (2) (874 SE2d 807) (2022).

OCGA § 16-5-102 (a) provides in pertinent part that "[a]ny person who

knowingly and willfully exploits a disabled adult, elder person, or resident, willfully

inflicts physical pain, physical injury, sexual abuse, mental anguish, or unreasonable

confinement upon a disabled adult, elder person, or resident, or willfully deprives of

essential services a disabled adult, elder person, or resident shall be guilty of a felony."

"Exploit" means "illegally or improperly using a disabled adult or elder person or that

person's resources through undue influence, coercion, harassment, duress, deception,

false representation, false pretense, or other similar means for one's own or another

---

[8] When the sets are considered separately, no merger problem arises because the counts within each set were based on separate incidents on separate days. See *Eleby*, supra, 319 Ga. at 248 (7); *Johnson*, supra, 313 Ga. at 159 (4); see also *Spears v. State*, 296 Ga. 598, 602 (2) (769 SE2d 337) (2015), disapproved on other grounds by *Willis v. State*, 304 Ga. 686, 706 (11) (a) n.3 (820 SE2d 640) (2018) (two burglaries at same victim's house were not part of a continuous course of conduct when defendant left victim's house, drove to a church, returned to house after realizing that he had failed to steal victim's cigarette case containing money, and reentered house with the intent to commit the theft of the cigarette case and money).

person's profit or advantage." OCGA § 16-5-100 (6) (2017 & 2018).[9] "Essential services" means "social, medical, psychiatric, or legal services necessary to safeguard a disabled adult's, elder person's, or resident's rights and resources and to maintain the physical and mental well-being of such person." OCGA § 16-5-100 (5). An "elder person" is "a person 65 years of age or older." OCGA § 16-5-100 (4).

The language of OCGA § 16-5-102 (a) is plain and susceptible to only one natural and reasonable construction: if a defendant, like Taylor, engages in a single course of conduct in which he both exploits an elder person and willfully deprives that person of essential services, he has committed distinct offenses and may be punished for each offense. Indeed, this Court has previously recognized that "there are many ways the crime of exploitation of an elder person may be committed[.]" *Austin*, supra, 356 Ga. App. at 846 (3). Significantly, OCGA § 16-5-102 (a) establishes that a person "shall be guilty of *a felony*" if he "knowingly and willfully exploits a[n] . . . elder person, . . . *or* willfully deprives of essential services a[n] . . . elder person," indicating that the statute criminalizes more than one act. (Emphasis supplied.) See *Terrell v.*

---

[9] This statutory provision has been amended since the time of Taylor's offenses. See Ga. L. 2021, Act 190, § 4. Otherwise, all relevant aspects of the statutory scheme regarding exploitation of an elder person have remained unchanged since the time of Taylor's offenses.

*State*, 353 Ga. App. 780, 784-785 (2) (839 SE2d 274) (2020) (convictions on three counts of furnishing items to inmates did not merge for sentencing purposes, because the plain language of the statute at issue "criminalized more than one act" in that it "unequivocally list[ed] a variety of specific items, separate[d] by semicolons, and [the defendant] was sentenced related to crimes involving distinct, separate items, identified in different statutory clauses"); cf. *Gonzales v. State*, 298 Ga. App. 821, 822-823 (1) (681 SE2d 248) (2009) (statute providing that "[a] person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by depriving him or her of a member of his body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof" provided "three different methods" by which a single offense — maliciously causing bodily harm to another — could be committed).

As is apparent from both common sense and the definitions in OCGA § 16-5-100, exploiting an elder person and willfully depriving that person of essential services involve two separate types of conduct and two separate consequences resulting therefrom. The former jeopardizes an elder person's finances, while the latter

jeopardizes that person's life. We may not disturb the legislature's choice to authorize multiple punishments based on these separate harms. See *Scott*, supra, 356 Ga. App. at 155 (5); see also *Smith v. State*, 290 Ga. 768, 774 (3) n.5 (723 SE2d 915) (2012) (the possibility for multiple punishment in the context of a high-speed chase involving several police officers makes sense, because the potential risk to officers and the general public is increased far more in the context of multiple officers or police vehicles being involved in a dangerous pursuit).

(ii) We further conclude that Taylor's twenty-two convictions for practicing medicine without a license and his one conviction for attempt to commit this offense did not merge for sentencing purposes.

The 22 counts of practicing medicine without a license in the indictment alleged that on 22 dates between May 2, 2017, and March 28, 2018, Taylor suggested at-home stem cell therapy for the cure of Johnson's foot ailment with the intention of receiving compensation and without having a license to practice medicine. The one count of attempt to practice medicine without a license alleged that on the day of his arrest, Taylor held himself out as being engaged in the treatment of human disease and arrived at Johnson's home with supplies for her treatment. Because these charges

were based on separate incidents on separate days where Taylor purported or attempted to treat Johnson's cancer, they did not arise from a single course of conduct. See *Eleby*, supra, 319 Ga. at 248 (7); *Johnson*, supra, 313 Ga. at 159 (4); see also *Spears v. State*, 296 Ga. 598, 602 (2) (769 SE2d 337) (2015), disapproved on other grounds by *Willis v. State*, 304 Ga. 686, 706 (11) (a) n.3 (820 SE2d 640) (2018).

(b) Second, Taylor argues that the indictment was unconstitutionally vague because it failed to provide adequate notice of (i) how he performed the medical services alleged in the charges of practicing medicine without a license, and (ii) why the services required the attendance of a licensed physician. We agree with the State that Taylor waived this argument by failing to raise it below.

"An indictment may be challenged by general or special demurrer. A general demurrer challenges the sufficiency of the substance of the indictment, whereas a special demurrer challenges the sufficiency of the form of the indictment." (Citations and punctuation omitted.) *Rivera v. State*, 317 Ga. 398, 405 (1) (a) (893 SE2d 696) (2023); see also *Chapman v. State*, 318 Ga. App. 514, 516 (1) (a) (733 SE2d 848) (2012) (a special demurrer "objects merely to [the indictment's] form or seeks more information") (citation omitted). Taylor's challenge to the lack of specificity in the

indictment is, in essence, a special demurrer. See *Stinson v. State*, 279 Ga. 177, 180 (2) (611 SE2d 52) (2005) (appellant's argument that felony murder indictment was deficient because it did not contain all the essential elements of the underlying crime of aggravated assault was, in essence, a special demurrer seeking greater specificity with regard to the predicate felony); *Chapman*, supra, 318 Ga. App. at 517 (1) (a) ("To the extent that [the defendant's] trial counsel should have sought greater specificity in the indictment, such an argument would be made in a special demurrer.").

"Special demurrers . . . must be made at or before arraignment or before trial or they are waived." (Citation and punctuation omitted.) *Rivera*, supra, 317 Ga. at 406 (1) (a). Taylor waived his asserted challenge to the lack of specificity in the indictment by failing to raise it at any point below. See *Totten v. State*, 276 Ga. 199, 201 (3) (577 SE2d 272) (2003) ("Inasmuch as appellant is challenging the form of the indictment for the first time on appeal, the objection is improper and has been waived."); *McDaniel v. State*, 298 Ga. App. 558, 560 (680 SE2d 593) (2009) ("If [the appellant] wanted to challenge the indictment's lack of specificity, he was required to file a timely special demurrer. Having failed to do so, however, he waived his right to be tried on a perfect indictment.").

For the foregoing reasons, we affirm Taylor's judgment and sentence and the denial of his motion for new trial.

*Judgment affirmed. Markle and Land, JJ., concur.*