**SECOND DIVISION**
**MILLER, P. J.,**
**RICKMAN and GOSS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 24, 2019**

# In the Court of Appeals of Georgia

A19A0717. HAWKINS v. THE STATE.

MILLER, Presiding Judge.

Following a two-week trial, a jury convicted Sheila Hawkins on 16 counts relating to Hawkins's role in the unlicensed operation of a care facility for disabled persons and the neglect and abuse endured by the residents of that facility. On appeal from her convictions, Hawkins raises numerous claims of error arising from her criminal proceedings and the denial of her motion for new trial. For the reasons provided below, we affirm in part, but we vacate three of Hawkins's convictions and remand for resentencing.

Viewed in the light most favorable to the verdict,[1] the evidence adduced at trial showed that Hawkins, a licensed professional counselor, was the manager and

---

[1] *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

director of Serene Reflections for Holistic Behavior and Wellness ("Serene Reflections"), a licensed mental health day facility for disabled adults. Hawkins's mother, Helen Bell, lived in a home on Windy Hill Road in Marietta, Georgia ("Windy Hill Home").

In late 2014, Charlene Walker, an employee of Serene Reflections, contacted law enforcement and informed them that Bell was operating an unlicensed facility for disabled adults out of the Windy Hill Home. When law enforcement arrived at the Windy Hill Home and knocked on the door, no one answered. The officers went to the back of the house and found three men locked in the basement. The men inside called out to the police and asked, "Are you here to help us?" Bell, who was still inside the house, eventually responded to law enforcement and unlocked the door to allow the officers to enter the basement.

The officers found three men living in the basement in terrible condition. One man, Robert Bacon, "was very dirty, smelled really bad, [had] unkempt long fingernails, [and] his teeth were rotten." Bacon complained to law enforcement that he was hungry and cold and that he "had to fill up the water bottle in the bathtub," and he "kept saying cold, cold, cold, cold, cold, and he wanted to keep running upstairs." Another man, Joseph Wilson, "smelled really bad. He wasn't shaven," and

2

his clothes were soiled and baggy. The third man, Travis McCargo, was wearing ripped clothing and kept saying to law enforcement the words "food" and "cold."

The room where the three gentlemen lived was dark, and the floors consisted of uncarpeted hard cement. The basement had a window with bars over it. The room was very cold, with no operational heating, to the point that "[y]ou could see your breath." The refrigerator and cabinets were chained and locked with a padlock. The cabinets could only be opened by Bell and contained clean linens and washcloths. The refrigerator, which could be opened by Wilson, contained only bread, condiments, and sliced bologna. Wilson regularly made bologna sandwiches for the three men, which constituted most of their meals. The bathroom had no doors and no toiletries such as soap, shampoo, or towels. The toilet did not flush, requiring the men to take water from the bath to flush the contents. Occasionally, that system did not work, and the men had to use a bucket to remove the toilet's contents and pour them on the ground. The bath did not have hot water, and the tub and the bathroom walls were very dirty and covered with mold. The basement also contained a washing machine and a dryer, but neither was functional. The beds were too small for the men, and they each had just a blanket and a pillow to sleep on with no sheets. In the bedrooms, "there was a severe stench of body odor and urine . . . it was very

3

prevalent. You could smell it when you came downstairs." A resident of Serene Reflections came to the basement on occasion to clean, but he testified that the basement was "not fit to live in."

Bell and some of her family members lived in the upstairs portion of the Windy Hill Home, which was furnished just as any normal home. The stairs that connected the basement to the rest of the house consisted of bare wood with carpet tacks sticking up from strips on each stair. The door to the upstairs was kept locked, and the men were not allowed to use the door or gain access to the upstairs portion of the house to do things such as use the bathrooms. When Bell did have contact with the residents, she was often verbally abusive.

Before residing at the Windy Hill Home, Travis McCargo lived with his adoptive mother, Katie McCargo, who also was taking care of Wilson and many other adults with mental health issues. Ms. McCargo eventually began taking Travis to Serene Reflections for day care. While Travis was at Serene Reflections, Hawkins discussed Travis's needs with Ms. McCargo. As recounted by Ms. McCargo's granddaughter, "Hawkins was very adamant that Travis needed residential care and referred Katie McCargo to a woman by the name of Helen Bell. Ms. Hawkins told Katie McCargo that Helen Bell ran a personal care home on Windy Hill Road in

4

Marietta, Georgia, that the home was licensed, and that Helen Bell was fully qualified to take care of Travis McCargo's needs." Ms. McCargo agreed to move Travis into the Windy Hill Home. Following Ms. McCargo's death, someone from Serene Reflections came and picked up Wilson and took him to the Windy Hill Home. Bacon had lived with Bell at a previous home before he was moved to the Windy Hill Home. While living at the Windy Hill Home, Wilson and Bacon were regularly taken by staff to Serene Reflections for a few hours a day. Wilson sometimes saw Bell at Serene Reflections to talk "business." Eventually, however, the staff stopped bringing Wilson and Bacon to the Serene Reflections campus, but Serene Reflections's therapists would visit them on occasion.

Charlene Walker began working for Serene Reflections after first being introduced to Bell. Bell informed Walker that Hawkins was looking for an employee to take care of two group homes (neither of which were the Windy Hill Home), and she then took Walker to meet with Hawkins, who hired Walker. According to Walker, Bell was not willing to take residents or clients for the Windy Hill Home from anywhere else other than Serene Reflections. During the operation of the Windy Hill Home, the staff of Serene Reflections had multiple discussions about the conditions

5

of the Windy Hill Home. According to Walker, Hawkins "was aware of the circumstances . . . in the home."

A grand jury indicted Hawkins on 16 counts relating to her role in the operation of the Windy Hill Home: one count of the unlicensed operation of a personal care home, in violation of OCGA § 31-7-12.1 (Count One); three counts of neglect of a disabled person, in violation of OCGA § 16-5-101 (Counts Two through Four); nine counts of the abuse of a disabled person, in violation of OCGA § 16-5-102 (Counts Five through Thirteen); and three counts of the exploitation of a disabled person, in violation of OCGA § 16-5-102 (Counts Fourteen through Sixteen).[2] The jury found Hawkins guilty on all counts. The trial court sentenced Hawkins to a total of 10 years' imprisonment and 20 years' probation. Hawkins filed a motion for a new trial, which she later amended after retaining new counsel. The trial court denied Hawkins's motion after a hearing, and this timely appeal followed.

1. Hawkins argues that the evidence was insufficient to support the jury's guilty verdict on multiple counts. We are not convinced.

---

[2] The trial court also imposed a $100,000 fine on the count of the unlicensed operation of a personal care home (Count One).

6

When we review challenges to the sufficiency of the evidence, we neither weigh the evidence nor judge the credibility of witnesses, but determine only whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

(Citation and punctuation omitted). *Moore v. State*, 340 Ga. App. 151, 153-154 (2) (796 SE2d 754) (2017). In addition,

[a] conviction may be based upon circumstantial evidence if the proved facts are not only consistent with the hypothesis of guilt, but exclude every other reasonable hypothesis but the guilt of the accused. OCGA § 24-4-6. When the evidence meets this test, circumstantial evidence is as probative as direct evidence, and whether this burden has been met is a question for the jury. When the jury is authorized to find that the evidence, though circumstantial, excluded every reasonable hypothesis except the defendant's guilt, the verdict will not be disturbed unless the verdict is insupportable as a matter of law. Further, while circumstantial evidence must exclude every other *reasonable* hypothesis but the defendant's guilt, the evidence need not exclude every inference or hypothesis.

(Citation omitted.) *Johnson v. State*, 291 Ga. App. 253, 254 (661 SE2d 642) (2008).

(a) Hawkins first argues that the evidence was insufficient to support her conviction for the unlicensed operation of a personal care home because the State did

7

not present evidence that the victims were not related by blood or marriage to her or Bell. We disagree.

"A facility shall be deemed to be an 'unlicensed personal care home' if it is unlicensed and not exempt from licensure and . . . [t]he facility is providing personal services and is operating as a personal care home as those terms are defined in OCGA § 31-7-12." OCGA § 31-7-12.1 (a) (1). OCGA § 31-7-12 defines a "personal care home" as "any dwelling, whether operated for profit or not, which undertakes through its ownership or management to provide or arrange for the provision of housing, food service, and one or more personal services *for two or more adults who are not related to the owner or administrator by blood or marriage*." (Emphasis added.) OCGA § 31-7-12 (a) (1).

At trial, Wilson testified that he had no family related by blood living in Georgia and that he did not know Bell before he moved into the Windy Hill Home. Ms. McCargo's granddaughter also testified at trial that Travis McCargo and Ms. McCargo first encountered Hawkins and Bell when they were searching for day health care for Travis and that Ms. McCargo did not know Bell until after they moved to Atlanta in 2012. Ms. McCargo also met Bell through Hawkins and Serene Reflections.

8

The evidence therefore demonstrates that at least two residents of the Windy Hill Home had no prior relationship with Hawkins or Bell before they either enrolled at Serene Reflections or resided at the Windy Hill Home. While this circumstantial evidence does not exclude every possible inference or hypothesis that the residents of the Windy Hill Home might have been related by blood or marriage to Hawkins or Bell (it is, after all, possible to be related to someone you have never met), we conclude that, in the absence of any evidence even hinting that Hawkins or Bell were related to any of the residents of the Windy Hill Home, the circumstantial evidence presented at trial was sufficient to exclude any other reasonable hypothesis but the conclusion that at least two of the residents of the Windy Hill Home were not related to Hawkins or Bell. See *Johnson*, supra, 291 Ga. App. at 254. We therefore conclude that there was sufficient evidence for the jury to conclude that the Windy Hill Home was a "personal care home" as defined in OCGA § 31-7-12 and convict Hawkins on this count.

(b) Hawkins argues that the evidence was insufficient to support her convictions for the neglect of disabled adults (Counts Two through Four) because the statute of conviction does not apply to "long-term care facilities" or an "agent or

9

employee thereof." For this argument, Hawkins relies on OCGA § 16-5-101 (b), which reads, "The provisions of this Code section shall not apply to

a . . . long-term care facility, nor any agent or employee thereof who is in good faith acting within the scope of his or her employment or agency . . . ."

This safe-harbor provision, however, is not part of the essential elements of the crime that the State needed to affirmatively prove at trial. The essential elements of the crime of neglect of disabled adults are instead found at OCGA § 16-5-101 (a), which directs that

> [a] guardian or other person supervising the welfare of or having immediate charge, control, or custody of a disabled adult . . . commits the offense of neglect to a disabled adult . . . when the person willfully deprives a disabled adult . . . of health care, shelter, or necessary sustenance to the extent that the health or well-being of such person is jeopardized.

Cf. *Smith v. State*, 301 Ga. 348, 351-352 (II) (801 SE2d 18) (2017) (concluding that the evidence was sufficient to support a conviction of neglect under OCGA § 16-5-101 (a) without referring to OCGA § 16-5-101 (b)). Thus, this enumeration is not a proper challenge to the sufficiency of the evidence. See *Moore*, supra, 340 Ga. App. at 153-154 (2) (noting that the test for sufficiency of the evidence is whether "a

10

rational trier of fact could have found the *essential elements* of the crime beyond a reasonable doubt") (emphasis added). Additionally, because the record does not show that Hawkins requested a jury charge below on any defense encapsulated in OCGA § 16-5-101 (b), and Hawkins does not argue on appeal that the trial court should have charged the jury on this defense ,[3] we will not address it for the first time on appeal when the jury was not provided an opportunity to pass on it in the first instance.

(c) Hawkins next argues that the evidence was insufficient to support her convictions for abuse by unreasonable confinement (Counts Eight through Ten). Hawkins argues that Wilson had a key to the basement door, that he and Bacon were allowed to come and go as they pleased, and that it was not unreasonable to confine McCargo due to his history of severe mental illness. We disagree.

"Any person who . . . willfully inflicts . . . unreasonable confinement upon a disabled adult . . . shall be guilty of a felony." OCGA § 16-5-102 (a). The statute of conviction does not define the term "unreasonable confinement." "We therefore look to the ordinary meaning of the words, given that they are not terms of art; and we look

---

[3] Because none of the defenses in OCGA § 16-5-101 (b) would have been Hawkins's "sole defense," the trial court would not have been required to sua sponte provide a charge on this defense under the rule announced in *Tarvestad v. State*, 261 Ga. 605, 606 (409 SE2d 513) (1991).

11

for the intention of the General Assembly." *Brown v. State*, 314 Ga. App. 1, 3 (723 SE2d 112) (2012). The word "confine" is defined as "1. To keep within bounds; restrict. 2. To shut within an enclosure; imprison. 3. To restrict in movement. And the word 'confinement' is defined as: 1. a. The act of confining. b. The state of being confined." (Citation and punctuation omitted.) Id.

The evidence adduced at trial was sufficient to show that McCargo, Wilson, and Bacon were confined. Wilson testified at trial that Bell had provided him with a key to the basement door, but he also testified that he was given strict instructions from Bell "[n]ot to leave out of the house without her permission going anywhere." When Wilson and Bacon would go to Serene Reflections for their classes, McCargo would stay at home in the basement, and the doors would be locked, as instructed by Bell, so that he could not get out. Evidence was also produced that the three men could not enter the upper portion of the house, even to use the restrooms. Moreover, when law enforcement arrived to inspect the Windy Hill Home, they found McCargo, Wilson, and Bacon locked in the basement. Law enforcement had to get Bell to unlock the door to allow them access, and there was no indication from that encounter that Wilson, or either of the other men, was able to open the door to let them enter at that time. From this evidence, a reasonable jury could conclude that the three men

12

were "kept within bounds," "shut within an enclosure," or "restricted in movement" such that they were confined. See *Brown*, supra, 314 Ga. App. at 3.

As to the reasonableness of the confinement, the jury was also presented with evidence showing the circumstances of the residents' confinement. The jury was presented with evidence that Bell wanted the door to remain locked to ensure that McCargo did not walk away from the premises, which could be dangerous due to his severe mental illness. The jury was also presented with evidence of the three men's mental illnesses, including prior incidents where some of the men exhibited uncontrollable behavior. On the other hand, the jury was provided with evidence of the poor conditions in which the men lived. The jury was further presented with evidence that, when law enforcement arrived at the Windy Hill Home, the men inside called out to the police and asked, "Are you here to help us?" Once the State produced evidence of a confinement, "[i]t [was] for the jury to decide" if the confinement was unreasonable. See *Moore*, supra, 340 Ga. App. at 154 (2). We therefore conclude that the evidence was sufficient to support Hawkins's convictions on these counts.

(d) Hawkins further argues that the evidence was insufficient to support a conviction for the exploitation of McCargo (Count Fourteen). She argues that there

13

was no evidence that McCargo's government benefits were obtained under undue influence, coercion, harassment, duress, or deception for profit and advantage. We are not convinced.

Under the Georgia Code, "Any person who knowingly and willfully exploits a disabled adult . . . shall be guilty of a felony." OCGA § 16-5-102 (a). The Code defines "exploit" as "illegally or improperly using a disabled adult . . . or that person's resources through undue influence, coercion, harassment, duress, deception, false representation, false pretense, or other similar means for one's own or another person's profit or advantage." OCGA § 16-5-100 (6) (2013).

Ms. McCargo's granddaughter testified at trial that "Hawkins was very adamant that Travis needed residential care," Hawkins "referred Katie McCargo to . . . Bell," and that Hawkins "told Katie McCargo that Helen Bell ran a personal care home on Windy Hill Road in Marietta, Georgia, that the home was licensed, and that Helen Bell was fully qualified to take care of Travis McCargo's needs." Travis McCargo's sister testified that, at Bell's instruction, the entire check that McCargo received from the Social Security Administration each month was sent first to Bell and then eventually to a bank account owned by Hawkins's son. In fact, the Windy Hill Home was not licensed. Based on her status as the director of a licensed care

facility, the jury was entitled to conclude that Hawkins understood that the fact that a facility is licensed would be a material consideration for family members seeking to place their disabled loved ones in a care facility. This evidence was sufficient to show that Hawkins, by misrepresenting that the Windy Hill Home was licensed, used deception, false representation, or false pretense in relation to a disabled person for her own or her family's profit or advantage, and so the evidence was sufficient to convict on this count. See OCGA §§ 16-5-100 (6) (2013), 16-5-102 (a); *Escamilla v. State*, 344 Ga. App. 654, 655-656 (1) (811 SE2d 77) (2018) (evidence sufficient to show exploitation through deception or undue influence when defendant informed the victim that the money would be used for one purpose when, in actuality, the money was used for the defendant's own personal gain).

2. Hawkins next argues that the trial court erred in allowing the testimony of Georgia Medicaid fraud examiners regarding the alleged billing practices of Serene Reflections because it failed to conduct the balancing test under OCGA § 24-4-403. However, this claim is belied by the record since the trial court did conduct the required balancing test. In addition, the evidence the fraud examiners presented consisted of investigations into Serene Reflections's billing practices in relation to the three men found at the Windy Hill Home, which were relevant to show Hawkins's

15

motives, her connection to the Windy Hill Home, and her exploitation of the three men as charged in Counts 14-16, such that any prejudice of the evidence they presented did not substantially outweigh their probative value. See *Entwisle v. State*, 340 Ga. App. 122, 131 (2) (796 SE2d 743) (2017) ("[I]t is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter. As we have noted, OCGA § 24-4-403 offers an extraordinary remedy that must be used sparingly because it results in the exclusion of concededly probative evidence. In close cases, the balance is struck in favor of admissibility.") (citation omitted). We conclude that the trial court did not err on this issue.

3. Relatedly, Hawkins argues that the trial court erred when it failed to provide a limiting instruction to the jury on the appropriate application of the fraud examiners' testimony of extrinsic acts to the facts of the case. The record shows, however, that the trial court did not provide a limiting instruction on this testimony because it had previously limited the testimony presented by the fraud examiners to evidence of investigations into the billing for the three men found at the Windy Hill Home and had specifically instructed the fraud examiners to limit their testimony accordingly. The trial court therefore concluded that no evidence of extrinsic acts was introduced, such as investigations into possible fraud involving the billing of other

16

clients, and no further limiting instruction was necessary. Because Hawkins does not address the trial court's reasoning on this point, this enumeration fails.

4. Hawkins next argues that the trial court erred when it instructed the jury on deliberate indifference because the trial court allowed the jury to infer an essential element of the crime, namely, her knowledge of wrongdoing. We disagree.

The trial court gave the following instruction on deliberate indifference:

> The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed their eyes to what would otherwise have been obvious. A finding beyond a reasonable doubt of conscious purpose to avoid enlightenment would permit an inference of knowledge.

> Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the act. Again, whether or not you draw any such inference is a matter solely within your discretion.

An inference "may not, consistent with the constitutional requirement that a criminal defendant's guilt must be proven beyond a reasonable doubt, lessen or shift the state's burden of proof." (Citation omitted.) *Isaacs v. State*, 259 Ga. 717, 734 (35) (b) (386 SE2d 316) (1989). "Whether an [inference] has such an impermissible effect

17

depends upon whether it is permissive or mandatory. A permissive [inference] is valid if it is rational. A mandatory inference or presumption concerning an element of the offense is invalid." (Citations omitted.) Id.

The trial court's instruction on deliberate indifference here was a permissive inference rather than a mandatory inference. The trial court instructed that the element of knowledge "may" be satisfied with an inference drawn from proof of deliberate indifference, that a finding of deliberate indifference "would permit" an inference of knowledge, and that "whether or not [the jurors drew] any such inference [was] a matter solely within [their] discretion." We conclude that this instruction "permits, but does not require, the jury to infer the [element of knowledge] from proof of [deliberate indifference]," and so it is a permissive inference. *Isaacs*, supra, 259 Ga. at 735 (35) (b). Because it is the law that the element of knowledge may be satisfied by a finding of deliberate indifference, see, e.g., *Hutchins v. State*, 326 Ga. App. 250, 259 (3) (756 SE2d 347) (2014), the trial court's instruction did not improperly or unconstitutionally shift the burden of proof.

5. Hawkins argues that the trial court erred when it prevented her from introducing into evidence the search warrant for the Windy Hill Home and the accompanying police report so as to allow her to cross-examine Cobb County

18

investigator Amy Worthington regarding the contents of the search warrant and the facts and circumstances surrounding the issuance of the search warrant. Hawkins argues that these documents were admissible by relying upon caselaw citing to former OCGA § 24-3-2, which decreed that "when, in a legal investigation, the conduct and motives of the actor are matters concerning which the truth must be found (i.e., are relevant to the issues on trial), then information, conversations, letters and replies, and similar evidence known to the actor are admissible to explain the actor's conduct." (Footnote and punctuation omitted.) *Entwisle*, supra, 340 Ga. App. at 129 (1) (b). "That Code section, however, was not carried over into the new Evidence Code." Id. Hawkins does not present any arguments as to how the documents could have been admissible under our current Evidence Code.[4] Moreover, the trial court did not limit Hawkins's ability to cross-examine the witness on the circumstances surrounding law enforcement's entry and search of the Windy Hill Home, as demonstrated by the fact that the defense continued on to question Officer Worthington about the warrant and the search after the trial court's ruling. Therefore, this enumeration fails.

_____

[4] Because the trial in this case occurred after January 1, 2013, the new Evidence Code governs the admission of evidence in this case. See *Parker v. State*, 296 Ga. 586, 588 (1) (769 SE2d 329) (2015).

19

6. Hawkins next argues that the prosecution impermissibly commented on her refusal to talk to the police at the time of her arrest during its cross-examination of her. We conclude, however, that Hawkins invited any error on this point when trial counsel told the State during a sidebar to "go there" and by informing the trial court that he "wanted [the State] to go there." See *Heidler v. State*, 273 Ga. 54, 61 (9) (537 SE2d 44) (2000) (concluding that defendant invited error when defense counsel "urged the trial court to allow" the testimony that the defendant was challenging on appeal).

7. Hawkins argues that the trial court improperly allowed the State to impeach Greg Roseberry, who helped produce a chart of Serene Reflections' finances that Hawkins relied on in her defense at trial, by presenting evidence of his prior conviction. Hawkins argues that the chart that Roseberry prepared was not hearsay because she provided all the data that was used in the chart, and Roseberry merely assembled the data into a chart, and, therefore, Roseberry should not have been impeached as a hearsay declarant. Hawkins also argues that the trial court erred when it denied her motion for a mistrial based on the improper impeachment. We disagree.

"Whether to declare a mistrial is a question committed to the discretion of the trial judge, and the denial of a mistrial is reversible error only if it appears that a

20

mistrial was essential to preserve the defendant's right to a fair trial." (Citation omitted.) *Dorsey v. State*, 331 Ga. App. 486, 491 (4) (771 SE2d 167) (2015). Hearsay is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OCGA § 24-8-801 (c). A "statement" is an "oral or written assertion." OCGA § 24-8-801 (a) (1). "When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked and, if attacked, may be supported by any evidence which would be admissible for those purposes if the declarant had testified as a witness." OCGA § 24-8-806.

During the direct examination of Hawkins, the defense introduced into evidence a chart that demonstrated Serene Reflections's Medicaid billings for Bacon and Wilson, to demonstrate that the amount of money involved would have been too small for Hawkins to have had a financial motive to exploit them. Hawkins testified that she "worked . . . together" on "the content of the chart" with Roseberry, who was her accountant and the accountant for Serene Reflections. Hawkins further testified that Roseberry "plugged in the information in the boxes" in the chart. We conclude that Roseberry was shown to be an author of the information in the chart, which was created outside of trial. Because Roseberry did not testify to that information at trial,

21

and Hawkins introduced the chart for the purpose of showing the true financial statements of Serene Reflections regarding the billing for Wilson and Bacon, the information in the chart was hearsay. See OCGA § 24-8-801 (c). The State therefore was entitled to impeach Roseberry's credibility, and, as a result, the trial court did not abuse its discretion when it denied Hawkins's motion for a mistrial based on the impeachment. See OCGA § 24-8-806; *Dorsey*, supra, 331 Ga. App. at 491 (4).[5]

8. Hawkins next argues that her trial counsel provided ineffective assistance at multiple points during the trial. We disagree.

To establish a claim of ineffective assistance of counsel, a defendant must show that "(1) her trial counsel's performance was professionally deficient and (2) but for such deficient performance there is a reasonable probability that the result of the trial would have been different. On appeal, this [c]ourt accepts the trial court's findings of fact, unless they are clearly erroneous. However, the trial court's legal conclusions are reviewed de novo." (Citation and punctuation omitted.) *Crankshaw v. State*, 336 Ga. App. 700, 702 (3) (786 SE2d 245) (2016).

---

[5] We note that the trial judge also provided a limiting instruction to the jury that they could only consider Roseberry's conviction to impeach his credibility and could not use it for any other purpose.

"Decisions regarding which witnesses to call, what motions to file, and other tactical decisions are within the province of the trial attorney after consultation with his client." (Citation omitted). *Howard v. State*, 267 Ga. App. 257, 259 (2) (b) (599 SE2d 231) (2004). Such knowing and conscious tactical decisions, "even if unwise," do not generally amount to ineffective assistance. (Citation omitted.) Id. Similarly, "[t]he decision of whether to interpose certain objections is a matter of trial strategy and tactics. Errors in judgment and tactical errors do not constitute denial of effective assistance of counsel." (Citation omitted.) *Crankshaw*, supra, 336 Ga. App. at 703 (3) (b).

(a) Hawkins first argues that her trial counsel was ineffective for failing to request a limiting instruction on the fraud examiners' testimony regarding an investigation into Serene Reflections for Medicaid fraud. This claim is belied by the record because trial counsel did (unsuccessfully) request a limiting instruction.

(b) Hawkins next argues that trial counsel was ineffective for allowing the State to comment on her refusal to speak to the police at the time of her arrest, as noted in Section 6, supra. At the outset, we note that Hawkins relies on our long line of precedent concluding that comments upon a defendant's silence or failure to come forward are categorically disallowed from evidence, specifically citing the Georgia

Supreme Court's decision in *Mallory v. State*, 261 Ga. 625, 630 (5) (409 SE2d 839) (1991). However, after the briefs were filed in this appeal, the Georgia Supreme Court concluded that *Mallory*'s categorical rule was inconsistent with Georgia's new Evidence Code and, therefore, does not apply in cases proceeding under the new Code. *State v. Orr*, S18G0994, __ Ga. __ (__ SE2d __) (May 6, 2019). Instead, the Georgia Supreme Court concluded that the "analysis now requires careful consideration of what specific sorts of evidence that come within the broad phrase 'silence or failure to come forward' may be properly offered under which particular evidence rules and theories." Id. at (4) (a).

Putting aside, however, the question of whether the State's comments on Hawkins's silence were permitted or forbidden under *Orr*, we conclude that counsel's decision here to not object to the State's comments was made as a part of trial strategy and was not "patently unreasonable." See *Sledge v. State*, 312 Ga. App. 97, 103 (2) (b) (717 SE2d 682) (2011) (noting that "trial tactics and strategy, no matter how mistaken in hindsight, are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them."). At trial, Hawkins's counsel made clear that he was urging the

24

State to comment on Hawkins's silence because he had discussed that aspect of the case with her and was generally aware that she would have a response to any cross-examination that counsel believed would be favorable with the jury. He informed the trial court that he believed that Hawkins would testify that law enforcement had not informed her what crimes she was charged with and that she told them, "[i]f you can't even tell me what I'm charged with, I'm sure my attorney wouldn't want me to talk to you." Counsel further stated, "I want him to go there, and I promise you, I'll punish him with it in closing. I want him to go there."[6] Thus, the record clearly reflects that his decision was based on a reasonable, knowing trial strategy, even if unwise, and so trial counsel was not deficient for failing to object to the State's comments on Hawkins's silence. See *Howard*, supra, 267 Ga. App. at 259 (2) (b). Compare *Cheeks v. State*, 325 Ga. App. 367, 368-369 (750 SE2d 753) (2013) (trial counsel provided deficient performance when she failed to object to extensive references to the defendant's silence and affirmatively testified that the failure to object was due to "nerves" and not because of any strategic reason).

---

[6] At the motion for new trial hearing, Hawkins's counsel did not deny that it was strategy and said that "there was a reason for me to say it, I'm sure."

(c) Hawkins argues that trial counsel was ineffective for failing to object to the introduction of her bank records, the victims' bank records, and her telephone records,[7] which she argues were all improperly admitted into evidence because they were not properly authenticated.[8]

However, at the motion for new trial hearing, trial counsel testified that he did not object to this documentary evidence for strategic reasons. Counsel testified that one of his key strategies at trial was to attempt to disassociate Hawkins from Bell and demonstrate to the jury that Hawkins was not involved with what Bell was doing at the Windy Hill Home. Trial counsel testified that he wanted the various bank records to be admitted into evidence because he "wanted to show Dr. Hawkins never received a red penny, not a red cent as far as those records were concerned." In addition, trial counsel testified, "the phone calls were supporting our

[7] The telephone records indicated that Hawkins and Bell attempted 1,400 telephone calls to each other during 2014. Inspector Isaza testified that, based on the calls that were answered, Hawkins and Bell spoke on average for 30 minutes every week.

[8] Hawkins additionally argues that counsel was ineffective for failing to object to the introduction of Bell's driver's license and to the introduction of testimony from from an inspector from the Cobb County district attorney's office regarding the Medicaid fraud files compiled by the office. Hawkins, however, does not provide any arguments as to how this evidence was inadmissible, and, thus, how counsel would have been ineffective for failing to object to this evidence.

theory that [Hawkins and Bell's] relationship was estranged . . . we were trying to use them to [Hawkins's] benefit." Accordingly, we conclude that trial counsel did not provide ineffective assistance in this regard. See *Crankshaw*, supra, 336 Ga. App. at 703 (3) (b) (trial counsel was not ineffective for failing to object to certain alleged hearsay evidence as a matter of trial tactics and strategy); *Howard*, supra, 267 Ga. App. at 259 (2) (b).

(d) Hawkins further argues that trial counsel was ineffective for failing to object to the introduction of a contact information form for Bacon that was kept by Serene Reflections, showing that Bell referred Bacon to Serene Reflections and for failing to object to related testimony by a doctor on staff with Serene Reflections's staff. However, Hawkins did not question trial counsel on this point at the motion for new trial hearing, and "[w]ithout trial counsel's testimony, it is extremely difficult to overcome" the presumption that counsel's performance "fell within a wide range of reasonable, professional conduct." *McPetrie v. State*, 263 Ga. App. 85, 92 (9) (587 SE2d 233) (2003). Moreover, there was overwhelming evidence otherwise establishing the connections between Hawkins and Serene Reflections on the one hand and Bell and the Windy Hill Home on the other, and so there was not "a reasonable probability that the result of the trial would have been different" without

27

this evidence. See *Crankshaw*, supra, 336 Ga. App. at 702 (3). We therefore conclude that Hawkins has not shown that trial counsel rendered ineffective assistance.

9. Finally, Hawkins argues that her convictions on Counts Eleven, Twelve, and Thirteen for abuse of a disabled person through the deprivation of essential services should have merged with her convictions on Counts Two, Three, and Four for the neglect of a disabled person. We agree.

"Whether offenses merge is a legal question, which we review de novo." (Footnote omitted.) *Mullis v. State*, 321 Ga. App. 720, 721 (742 SE2d 750) (2013). Although the issue of merger was not raised below, we "have the discretion to correct merger errors sua sponte." (Citation omitted.) *Metcalf v. State*, __ Ga. App. __ (825 SE2d 909) (2019).

Among other provisions, a crime merges into another if it "is established by proof of the same or less than all the facts" that were required to establish the other crime. OCGA § 16-1-6. To determine whether two distinct statutory crimes merge, we use the required evidence test, which asks "whether each statutory provision requires proof of a fact which the other does not. If so, then two offenses exist, and one is not 'included in' the other." (Punctuation and citation omitted.) *Metcalf*, supra, __ Ga. App. at ___.

28

The crime of neglect of a disabled person occurs when a person "willfully deprives a disabled adult . . . of health care, shelter, or necessary sustenance to the extent that the health or well-being of such person is jeopardized." OCGA § 16-5-101 (a). On the other hand, "[a]ny person who . . . willfully deprives of essential services a disabled adult" shall be guilty of abuse of a disabled person. OCGA § 16-5-102 (a). "Essential services" is defined in OCGA § 16-5-100 (5) (2013) as

> social, medical, psychiatric, or legal services necessary to safeguard a disabled adult's . . . rights and resources and to maintain the physical and mental well-being of such person. Such services may include, but not be limited to, the provision of medical care for physical and mental health needs, assistance in personal hygiene, food, clothing, adequately heated and ventilated shelter, and protection from health and safety hazards.

Here, the grand jury charged in the indictment that Hawkins and her co-conspirators committed the offense of neglect (constituting Counts Two, Three, and Four) by "willfully depriv[ing McCargo, Wilson, and Bacon] of health care, shelter, and sustenance to the extent that the health and well-being of such person[s] was jeopardized." Similarly, the grand jury charged in Counts Eleven, Twelve, and Thirteen that Hawkins and her co-conspirators commited the offense of abuse by "willfully depriv[ing McCargo, Wilson, and Bacon] of . . . the provision of shelter

29

that was free from health and safety hazards in and around the shelter; adequately heated and ventilated shelter; assistance in personal hygiene, including proper bathing and toiletry facilities; the provision of adequate clothing; the provision of adequate and nutritionally balanced meals."

We conclude that these offenses, at least as charged in the instant case, merge under the required evidence test. The crime of neglect does indeed require proof of an additional element that the crime of abuse by deprivation does not—namely, that the deprivation be "to the extent that the health or well-being of [the victim] is jeopardized." OCGA § 16-5-101 (a). However, the crime of abuse by deprivation, as charged here, does not require the proof of any additional facts that the crime of neglect does not. All of the acts of deprivation charged in the indictment for the counts of abuse by deprivation fell under the categories of deprivation "of health care, shelter, and sustenance" that were used to support the convictions for neglect. See OCGA §§ 16-5-101 (a), 102 (a). While the broad statutory definition of "essential services" may include some services that do not fall under the categories of deprivation listed in the statute of conviction for neglect, "the important question [under the required evidence test] is not . . . whether the crimes have overlapping elements, but whether, looking at the evidence required to prove each crime, one of

30

the crimes was established by proof of the same or less than all the facts required to establish the commission of the other crime charged." (Citation omitted.) *Metcalf*, supra, ___ Ga. App. at ___. Under these circumstances, Hawkins's convictions on Counts Eleven, Twelve, and Thirteen for abuse by deprivation of essential services merged into her convictions on Counts Two, Three, and Four for neglect. Thus, Hawkins's convictions on these counts "must therefore be vacated and the case remanded to the trial court for resentencing." (Citation omitted.) *Mullis*, supra, 321 Ga. App. at 722.

In conclusion, for the reasons provided above, we vacate Hawkins's convictions on Counts Eleven, Twelve, and Thirteen, and we remand for resentencing. We affirm Hawkins's convictions and sentence in all other respects.

*Judgment affirmed in part and vacated in part and case remanded. Rickman and Goss, JJ., concur.*

31